## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Southern Division)

| | |
|---|---|
| ALAN I. ROTH,<br>5129 Dixie Hwy, Suite 105<br>Louisville, KY  40216,<br>Individually and On Behalf of All Others<br>Similarly Situated,<br><br>       Plaintiff,<br><br>  v.<br><br>EMERGENT BIOSOLUTIONS INC.,<br>400 Professional Drive, Suite 400,<br>Gaithersburg, MD 20879,<br><br>and<br><br>ROBERT G. KRAMER,<br>400 Professional Drive, Suite 400,<br>Gaithersburg, MD 20879,<br><br>and<br><br>RICHARD S. LINDAHL,<br>400 Professional Drive, Suite 400,<br>Gaithersburg, MD 20879,<br><br>and<br><br>SYED T. HUSAIN,<br>9310 Athena Circle, Suite 130<br>La Jolla, CA 92037,<br><br>       Defendants. | Case No. _____<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## I.      NATURE OF THE CASE

1.       This is a class action for violations of the federal securities laws brought by Plaintiff Alan I. Roth ("Plaintiff"), individually and on behalf of all persons who purchased or otherwise acquired Emergent BioSolutions Inc. ("Emergent" or the "Company") common stock between April 24, 2020, and April 16, 2021, inclusive (the "Class Period"). Plaintiff alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") (17 C.F.R. § 240.10b-5), against: (i) Emergent; (ii) Emergent's President and Chief Executive Officer ("CEO") Robert G. Kramer ("Kramer"); (iii) Emergent's Executive Vice President, Chief Financial Officer ("CFO"), and Treasurer Richard S. Lindahl ("Lindahl"); and (iv) former Senior Vice President and Emergent's Head of Contract Development and Manufacturing Syed T. Husain ("Husain") (collectively, "Defendants").

2.       Plaintiff alleges the following based upon personal knowledge with respect to Plaintiff's own acts and upon information and belief as to all other matters based on the investigation undertaken by the undersigned counsel and their agents. Counsel's investigation includes, among other things, a review and analysis of: (i) public filings by Emergent with the SEC; (ii) press releases, public reports, and news articles; (iii) research reports by securities and financial analysts; (iv) economic analysis of securities movement and pricing data; (v) transcripts of investor calls with Emergent senior management; and (vi) other publicly available material and data identified herein. Counsel's investigation into the factual allegations contained herein is continuing and many of the facts supporting Plaintiff's allegations are known only to Defendants or are exclusively within their custody or control. Plaintiff believes that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

#3800655v.1

## II.   OVERVIEW

3.     Emergent is a specialty biopharmaceutical company that develops vaccines and antibody therapeutics for infectious diseases. In response to the novel strain of coronavirus (SARS-CoV-2) causing COVID-19 disease ("COVID-19") pandemic, Emergent signed a series of deals with Johnson & Johnson ("J&J") and AstraZeneca worth a combined $876 million to provide contract development and manufacturing organization ("CDMO") services to produce the companies' COVID-19 vaccine candidates.  Emergent received a further $628 million from the U.S. government as a part of the Warp Speed Program, for a total of over $1.5 billion in COVID-19 deals.

4.     On April 23, 2020, the Company first announced that it had entered into an agreement with J&J to be the U.S. manufacturing partner for J&J's COVID-19 vaccine candidate based out of Emergent's manufacturing facility in the Bayview neighborhood of Baltimore, Maryland.  At the time of this initial announcement, Defendants touted its Baltimore facility's "unique capabilities across four independent suites to produce at clinical scale to get candidates rapidly into the clinic, while at the same time scaling up to enable large-scale manufacturing . . . to prepare for production of commercial volumes to meet customer demand."

5.     In the following months, as the J&J deal expanded and Emergent signed a similar agreement with AstraZeneca, the Company continued to tout its ability and capacity to mass manufacture COVID-19 vaccines at its Baltimore facility. Defendant Kramer, Emergent's President and CEO, stated that the Company was "uniquely prepared to answer the call for [the] COVID-19 pandemic" because of its "proven manufacturing capabilities in place." And throughout the Class Period, Defendants repeatedly assured investors of Emergent's ability to manufacture COVID-19 vaccines and fulfill its contracts with J&J and AstraZeneca.

2

6.      For example, Defendant Husain, the Company's Head of Contract Development and Manufacturing stated that "Emergent stands ready alongside leading innovators to rapidly deploy our CDMO services to help meet the substantial demand for a vaccine – anchored on our foundational expertise in development and manufacturing and propelled by our commitment to our mission – to protect and enhance life." And, Defendant Lindahl, the Company's CFO and Treasurer, represented that J&J and AstraZeneca selected the Company due to its "history . . . of high-quality manufacturing [and] delivering on complex problems."

7.      Emergent's COVID-19 vaccine deals sent the Company's stock soaring, closing at over $134 per share on August 13, 2020. But, as alleged below, the price of Emergent common stock was artificially inflated as the Company had failed to disclose to investors a myriad of manufacturing and quality control issues at its Baltimore facility that would prevent it from effectively manufacturing the vaccines.

8.      Investors began to learn the truth, after the close of markets on March 31, 2021, when media reports revealed that employees at Emergent's Baltimore facility had "mixed up" ingredients for the J&J and AstraZeneca vaccines, contaminating up to 15 million doses of the J&J vaccine. Reports further indicated that the Food and Drug Administration ("FDA") had "repeatedly . . . cited Emergent for problems such as poorly trained employees, cracked vials and problems managing mold and other contamination around one of its facilities." Further, it was revealed that an April 2020 FDA inspection of Emergent's Baltimore facility had uncovered "a series of quality control shortcomings" including, among other things, the "fail[ure] to ensure that electronic data generated through testing of drug ingredients 'was protected from deletion or manipulation,'" the failure to "follow proper testing and lab procedures," and "carelessness in the handling of rejected materials in the [Baltimore] Bayview plant."

3

9.     In response to this news, shares of Emergent's stock fell $12.45 per share, or over 13%, from a close of $92.91 per share on March 31, 2021, to close at $80.46 per share on April 1, 2021.

10.    It was subsequently revealed that between October 2020 and January 2021 the Company had discarded millions of doses of AstraZeneca vaccine because of contamination concerns and that a June 2020 report had concluded that Emergent's Baltimore facility lacked enough trained staff and had a record of problems with quality control, and as such, was poorly equipped to handle larger scale projects, such as the COVID-19 vaccine projects. Such revelations were no surprise to the Company, but investors had no way of knowing the true nature of Emergent's manufacturing and quality control issues, prior to March 2021. Following these reports, the Biden administration made the "extraordinary move" of putting J&J in charge of Emergent's Baltimore facility and prohibiting the facility from producing the AstraZeneca vaccine.

11.    Then, on April 19, 2021, the Company revealed that, "at the request of the FDA, Emergent agreed not to initiate the manufacturing of any new material at its Bayview facility and to quarantine existing material manufactured at the Bayview facility pending completion of the [FDA's] inspection and remediation of any resulting findings."

12.    In response to this news, the price of Emergent's common stock declined $9.77 per share, or more than 12%, from a close of $77.64 per share on April 16, 2021, to close at $67.87 per share on April 19, 2021.

13.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and the other Class (defined below) members have suffered significant losses and damages.

## III.    JURISDICTION AND VENUE

14.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa). A substantial portion of the acts in furtherance of the alleged fraud, including the preparation and dissemination of materially false and misleading information and the effects of the fraud, have occurred in this Judicial District. In addition, the Company's headquarters are located in this District at 400 Professional Drive, Suite 400, Gaithersburg, Maryland 20879.

17.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

## IV.    PARTIES

18.     Plaintiff Alan I. Roth purchased Emergent common stock (as set forth in the accompanying certification attached hereto as Exhibit A) at artificially inflated prices during the Class Period and suffered damages as a result of the misconduct alleged herein. Plaintiff's address is 5129 Dixie Hwy, Suite 105, Louisville, Kentucky 40216.

19.     Defendant Emergent BioSolutions Inc. is a Maryland corporation with its headquarters located at 400 Professional Drive, Suite 400, Gaithersburg, Maryland 20879.

Emergent's common stock is traded on the New York Stock Exchange ("NYSE") under the symbol "EBS."

20.     Defendant Robert G. Kramer was, at all relevant times, the President and CEO of Emergent, and was a member of the Company's Board of Directors. Defendant Kramer's address is 400 Professional Drive, Suite 400, Gaithersburg, Maryland 20879.

21.     Defendant Richard S. Lindahl was, at all relevant times, Executive Vice President, CFO, and Treasurer of Emergent. Defendant Lindahl's address is 400 Professional Drive, Suite 400, Gaithersburg, Maryland 20879.

22.     Defendant Syed T. Husain was, at all relevant times, Senior Vice President at Emergent and Head of the Company's Contract Development and Manufacturing business unit. Defendant Husain's address is 9310 Athena Circle, Suite 130, La Jolla, California 92037.

23.     Defendants Kramer, Lindahl, and Husain are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, throughout the Class Period, because of their positions with the Company, possessed the power and authority to control the contents of Emergent's reports to the SEC, as well as its press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant, while serving as a senior executive of Emergent, was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were then materially false and/or misleading. The

Individual Defendants are liable for the false statements pleaded herein, as those statements were each group-published information and were the result of the collective actions of the Individual Defendants.

## V.     DEFENDANTS' FRAUDULENT SCHEME

### A.     Background

24.    Emergent, headquartered in Gaithersburg, Maryland, is a global life sciences company that provides preparedness and response solutions addressing accidental, deliberate, and naturally occurring public health threats.   The Company's CDMO business unit provides development services, bulk drug substance manufacturing, fill, finish, and packaging of final drug product, and "molecule-to-market" offerings. These services are provided to other biopharmaceutical companies, government agencies, and non-government organizations. Central to the Company's CDMO business is its manufacturing facility located in the Bayview neighborhood of Baltimore, Maryland.

### B.     Defendants' Materially False and Misleading Statements

25.    The Class Period begins on April 24, 2020, the day after Emergent announced that it had entered into an agreement with J&J to manufacture J&J's COVID-19 vaccine candidate at the Company's Baltimore facility. Under the deal, initially valued at $135 million, Emergent would provide drug substance manufacturing services and reserve large-scale manufacturing capacity for J&J.

26.    Defendants touted the deal with J&J explaining that the Company's Baltimore facility was "designed for rapid manufacturing of vaccines and treatments in large quantities during public health emergencies" and had "unique capabilities across four independent suites to produce at clinical scale to get candidates rapidly into the clinic, while at the same time scaling

7

up to enable large-scale manufacturing to up to 4000L to prepare for production of commercial volumes to meet customer demand."

27.     According to Defendant Husain, the Company's Head of Contract Development and Manufacturing, the Company "will leverage [its] talents, capabilities, and capacities up to 300 million doses to advance this much-needed vaccine candidate and ensure ongoing commercial supply through our CDMO services."

28.     Defendants continued to tout the J&J deal when reporting the Company's first quarter 2020 financial results on April 30, 2020.  Among other things, Defendant Husain emphasized that "Emergent has been able to rapidly respond and deploy capability, capacity, and expertise in response to the COVID-19 pandemic."  Similarly, Defendant Kramer, the Company's President and CEO, represented that Emergent "is uniquely positioned in this [pandemic] environment" and has "proven manufacturing capabilities in place" to respond to the COVID-19 pandemic.

29.     On June 1, 2020, Emergent issued a press release announcing that the U.S. government awarded it an approximately $628 million contract, as part of the Warp Speed Program, the national program to accelerate the development, manufacturing, and distribution of COVID-19 vaccines, therapeutics, and diagnostics. Under the contract, Emergent would be "creating a U.S.-based manufacturing supply chain for pharmaceutical and biotechnology innovators of COVID-19 vaccine candidates." Defendant Kramer stated that "[o]ur longstanding record of delivering safe and effective medical countermeasures for public health positions us to continue to help at this critical moment by advancing COVID-19 vaccine programs of our fellow innovators in the industry."

30.     On June 11, 2020 Emergent announced that it had signed another agreement – valued at $87 million – to provide contract development and manufacturing services and secure large-scale manufacturing capacity to support AstraZeneca's COVID-19 vaccine candidate. In announcing this deal, Emergent's President and CEO, Defendant Kramer stated, "[w]ith this agreement, we bring to our facilities two of the five leading candidates being developed with U.S. government funding."

31.     On July 6, 2020, Emergent issued another press release announcing that its initial agreement with J&J had been expanded to a five-year deal.  Under the agreement, valued at $480 million for the first two years, Emergent would begin manufacturing J&J's COVID-19 vaccine in 2021 at the Company's manufacturing facility in Baltimore. In announcing the agreement, Defendant Kramer highlighted the Company's "manufacturing strength to address the COVID-19 pandemic." Defendant Husain added that Emergent had "the expertise and capabilities to meet the long-term needs of [its] customers and provide ongoing commercial manufacturing to benefit patients."

32.     On July 27, 2020, Emergent issued a press release announcing yet another deal with AstraZeneca to provide services to support production of its COVID-19 vaccine candidate. Under this deal, valued at approximately $174 million, Emergent was to produce drug substance manufacturing services at its Baltimore facility, beginning in 2020, at a scale for commercial supply. In the press release, Defendant Husain stated, "Emergent stands ready alongside leading innovators to rapidly deploy our CDMO services to help meet the substantial demand for a vaccine – anchored on our foundational expertise in development and manufacturing and propelled by our commitment to our mission – to protect and enhance life."

33.     On July 30, 2020, the Company reported its second quarter 2020 financial results and conducted an investor conference call. During the call, Defendant Kramer once again touted the Company's manufacturing capacity, stating that "Emergent is uniquely prepared to answer the call for [the] COVID-19 pandemic" with the Company's "proven manufacturing capabilities in place."

34.     On September 14, 2020, the Company presented at the Morgan Stanley Global Healthcare Conference. Defendant Lindahl, in explaining why both J&J and AstraZeneca chose Emergent to manufacture their respective vaccine candidates, stated:

> [Q]uite simply, it's the history we have of high-quality manufacturing of delivering on complex problems of the fact that we had capacity available in the -- primarily in the Bayview facility that we have, which was designed expressly for the purpose in partnership with the government of dealing with an emergency just like COVID. It was actually -- the emergency that was contemplated was a pandemic flu situation, but there are 4 separate manufacturing suites that are very flexible, and each one can handle a different set of applications and be set up to move very rapidly, and that's exactly what we're doing right now.  So it's really that history we have plus the capacity we had available that gave both of those companies the confidence that we were the right partner for them in this situation.

35.      On November 5, 2020, Emergent reported financial results for the third quarter 2020 and conducted an investor conference call. In response to an analyst inquiry regarding Emergent's ability to handle multiple COVID-19 vaccine clients, Defendant Husain responded that the Company's facilities are "designed to handle multiple products . . . the drug substance facility in Baltimore, which is known as our Bayview facility, so right now, that is predicated on multiple products being in there."

36.     On February 18, 2021, the Company reported its fourth quarter 2020 financial results. During Emergent's conference call with investors, Defendant Kramer stated that Emergent was "playing a critical role in the fight against COVID-19 with the development and manufacturing of clinical and commercial materials across our three CDMO service pillars for a

10

variety of customers, most notably Johnson & Johnson, AstraZeneca . . . ." In response to analyst inquiry, Defendant Kramer stated, "[s]pecific to J&J, you know what they said in terms of their short-term goal is to provide as many as 100 million doses to the U.S. government in the first half of 2021 and we're right on schedule to support that."

37.     The above statements in ¶¶ 25-36 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose that: (i) Emergent's Baltimore facility had a history of manufacturing issues increasing the likelihood for massive contaminations; (ii) the Baltimore facility had received a series of FDA citations as a result of these contamination risks and quality control issues; (iii) Emergent had been forced to discard millions of doses of COVID-19 vaccines after workers at the facility deviated from manufacturing standards; and (iv) as a result of the foregoing, Defendants' public statements about Emergent's ability and capacity to mass manufacture multiple COVID-19 vaccines at its Baltimore facility were materially false and/or misleading and/or lacked a reasonable basis.

**C.     The Truth is Revealed**

38.     On March 31, 2021, after the close of the markets, *The New York Times* published an article reporting on the accidental contamination of COVID-19 vaccines developed by J&J and AstraZeneca at Emergent's Baltimore facility. *The New York Times* article stated that in late February 2021, Emergent employees at the Baltimore facility mixed up ingredients of the two different COVID-19 vaccines, contaminating up to 15 million doses of J&J's vaccine and forcing regulators to delay authorization of the facility's production lines. Also, "[f]urther shipments of the Johnson & Johnson vaccine — expected to total 24 million doses in the next month — were supposed to come from the giant plant in Baltimore" but "[t]hose deliveries are now in question while the quality control issues are sorted out."

11

39.     *The New York Times* article further noted that Emergent's massive vaccine contamination went undiscovered for days until J&J's quality control checks uncovered it, raising questions about Emergent's training and supervision of its employees during the production process.

40.     The next morning, April 1, 2021, the *Associated Press* reported, based on documents obtained through the Freedom of Information Act, that the FDA had "repeatedly . . . cited Emergent for problems such as poorly trained employees, cracked vials and problems managing mold and other contamination around one of its facilities."

41.     Also according to the *Associated Press*, an April 2020 FDA inspection of Emergent's Baltimore facility had revealed "a series of quality control shortcomings" including, among other things, the "fail[ure] to ensure that electronic data generated through testing of drug ingredients 'was protected from deletion or manipulation,'" the failure to "follow proper testing and lab procedures," and "carelessness in the handling of rejected materials in the Bayview plant."

42.     On this news, Emergent's stock price substantially declined from a close of $92.91 per share on March 31, 2021, to $80.46 per share at the close of trading on April 1, 2021—a drop of $12.45, or over 13%, per share.

43.     On April 3, 2021, *The New York Times* reported that the Biden administration had made the "extraordinary move" of putting J&J in charge of Emergent's "troubled Baltimore manufacturing plant" and "moved to stop the plant from making [the] vaccine by AstraZeneca." The article cited the "mixed up ingredients" and noted that "[b]y moving the AstraZeneca vaccine out . . . the plant can be solely devoted to the [J&J] single-dose vaccine and avoid future mishaps.

#3800655v.1

The article called the stripping of Emergent's control over its own plant "a significant setback and a public relations debacle."

44.     On April 6, 2021, *The New York Times* published another report, citing undisclosed internal documents and interviews with current and former federal officials, as well as Company employees. According to *The New York Times*, its "examination . . . of manufacturing practices at the Baltimore facility found serious problems, including a corporate culture that often ignored or deflected missteps and a government sponsor, the Biomedical Advanced Research and Development Authority, that acted more as a partner than a police officer." Further, based on its investigation, the report "depict[ed] a factory operation that was ill-equipped to take on such a mammoth manufacturing task" and that the recent contamination "was not the first time the company threw out coronavirus vaccine for fear of contamination."

45.     In fact, "[b]etween early October and January, Emergent discarded five lots of AstraZeneca vaccine — each the equivalent of two million to three million doses — because of contamination or suspected contamination, according to internal logs, a government official and a former company supervisor." Moreover, documents reviewed by *The New York Times* revealed that "[a]udits and investigations — including ones conducted in 2020 by Johnson & Johnson, AstraZeneca, two federal agencies and Emergent's own quality evaluators — found that Emergent had not followed some basic industry standards at the Baltimore plant, and identified repeated shortcomings in efforts to disinfect and prevent contamination." Importantly, "[a]n audit conducted for AstraZeneca specifically highlighted the risks of viral cross-contamination, which experts believe was responsible for tainting the millions of Johnson & Johnson doses."

46.     The same day, *The New York Times* reported that Carlo de Notaristefani, a manufacturing expert who has been overseeing production of COVID-19 vaccines for the federal

government since May 2020, had issued a report in June 2020 concluding that Emergent's Baltimore facility lacked enough trained staff and had a record of problems with quality control. According to Notaristefani, the Baltimore facility—which had typically been used by the Company for smaller projects—was poorly equipped to handle larger scale projects and would need to expend "significant resources" and "strengthen" its quality controls in order to handle the COVID-19 manufacturing projects.

47.     The consequences of Emergent's deficiencies further emerged on April 19, 2021, when Emergent announced that, "at the request of the FDA, Emergent agreed not to initiate the manufacturing of any new material at its Bayview facility and to quarantine existing material manufactured at the Bayview facility pending completion of the [FDA's] inspection and remediation of any resulting findings."

48.     On this news, the price of Emergent common stock declined an additional $9.77 per share, or more than 12%, from a close of $77.64 per share on April 16, 2021, to close at $67.87 per share on April 19, 2021.

## VI.    LOSS CAUSATION/ECONOMIC LOSS

49.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Emergent common stock, by publicly issuing false and misleading statements and failing to disclose material facts necessary to make Defendants' statements not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, as well as its business and operations.

50.     Defendants' alleged unlawful conduct caused the losses incurred by Plaintiff and the Class. The market for Emergent's common stock was open, well developed, and efficient at all relevant times. Throughout the Class Period, Emergent's common stock traded at artificially

inflated prices as a direct result of Defendants' materially misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public. Plaintiff and other members of the Class purchased or otherwise acquired Emergent common stock relying upon the integrity of the market price for Emergent's common stock and market information relating to the Company and have been damaged thereby.

51.     When the relevant truth became known, the price of Emergent's common stock declined immediately and precipitously as the artificial inflation was removed from the market price of the stock, causing substantial damage to Plaintiff and the Class. The economic loss, *i.e.*, damage, suffered by Plaintiff and other members of the Class was a direct result of: (i) Defendants' materially false and misleading statements about Emergent's ability and capacity to mass manufacture COVID-19 vaccines at its Baltimore facility; and (ii) the subsequent decline in the value of Emergent's common stock price as the relevant truth was revealed in the adverse disclosures on March 31, 2021, April 1, 2021, and April 19, 2021.

52.     The declines in the price of Emergent common stock after the truth came to light were a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Emergent's common stock price declines negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or factors unrelated to Defendants' fraudulent conduct.

## VII.    SCIENTER ALLEGATIONS

53.     As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and

15

substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

54.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Emergent, their control over, receipt and/or modification of Emergent's allegedly materially misleading statements and omissions, and/or their position with the Company which made them privy to confidential information concerning Emergent, participated in the fraudulent scheme alleged herein.

55.     Moreover, published reports have established that Emergent knew, as early as April 2020, that an FDA inspection of the Baltimore facility had revealed "a series of quality control shortcomings" including, among other things, the "fail[ure] to ensure that electronic data generated through testing of drug ingredients 'was protected from deletion or manipulation,'" the failure to "follow proper testing and lab procedures," and "carelessness in the handling of rejected materials in the Bayview plant."

56.     Scienter is further established by significant insider trading by Emergent executives who dumped millions of dollars in stock weeks before the truth about the Company's operations surfaced.  Specifically, Defendant Kramer sold more than $10 million of Emergent common stock during the Class Period while the truth about Emergent's operations remained concealed from investors. According to reports, Defendant Kramer was able to purchase the stock for about $2.5 million, pursuant to his compensation package with the Company, and then sell the shares at the artificially inflated market price in January and early February 2021.  As noted by *The Washington Post*, "[t]he transactions were Kramer's first substantive sales of Emergent stock since April 2016 . . . ."

16

## VIII.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

57.     The statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under the Private Securities Litigation Reform Act of 1995 do not apply to the misleading statements and omissions alleged herein.

58.     The statements by Defendants alleged to be false and misleading all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

59.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Emergent who knew that the statement was false when made.

## IX.   CONTROLLING PERSON ALLEGATIONS

60.     By virtue of the Individual Defendants' positions of management and control within the Company, they had access to undisclosed adverse information about Emergent's ability and capacity to mass manufacture COVID-19 vaccines at its Baltimore facility. The Individual Defendants ascertained such information through Emergent's internal corporate documents, conversations, and connections with each other and with corporate officers and employees, attendance at Board of Directors meetings, including committees thereof, and through

17

reports and other information provided to them in connection with their roles and duties as Emergent officers, directors, and managers.

61.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and other communications complained of herein, and knew or recklessly disregarded that there were materially misleading statements and omissions contained therein. Because of their Board, executive, or managerial positions with Emergent, each of the Individual Defendants had access to the adverse undisclosed information about Emergent's ability and capacity to mass manufacture COVID-19 vaccines at its Baltimore facility, as particularized herein, and knew (or were deliberately reckless in not knowing) that this information rendered the representations made by or about Emergent and its business, or adopted by the Company, materially false and misleading.

62.    The Individual Defendants, because of their positions of control and authority as officers or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein, and is therefore primarily liable for the representations therein.

63.    As officers, directors, and controlling persons of a publicly held company whose common stock is registered with the SEC pursuant to the Exchange Act, is traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's

Emergent's ability and capacity to mass manufacture COVID-19 vaccines at its Baltimore facility, as particularized herein, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based on truthful and accurate information. The Individual Defendants' materially misleading statements and omissions during the Class Period violated these specific requirements and obligations.

## X.    CLASS ACTION ALLEGATIONS

64.    Plaintiff brings this action individually and as a class action, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), on behalf of a class consisting of all those who purchased or otherwise acquired Emergent common stock during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of Defendants' immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)), any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest, or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

65.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Throughout the Class Period, Emergent's common stock was actively traded on the NYSE, an open and efficient market, under the symbol "EBS." Millions of Emergent shares were traded publicly during the Class Period on the NYSE. As of April 16, 2021, Emergent had approximately 53.5 million shares of common stock outstanding. Record owners and the other members of the Class may be identified from records

19

maintained by Emergent and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

66.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

67.     Plaintiff will fairly and adequately protect the interests of the other members of the Class, and has retained counsel competent and experienced in class and securities litigation.

68.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      a.     Whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

      b.     Whether Defendants participated in and pursued the common course of conduct complained of herein;

      c.     Whether documents, press releases, and other statements disseminated to the investing public and the Company's stockholders during the Class Period misrepresented material facts about the business, finances, value and prospects of Emergent;

      d.     Whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose facts about the business, finances, value, and performance of Emergent;

      e.     Whether the market price of Emergent common stock during the Class Period was artificially inflated due to the material misrepresentations and

failures to correct the material misrepresentations complained of herein; and

   f.   The extent to which the members of the Class have been damaged and the proper measure of damages.

69.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI.   PLAINTIFF AND CLASS MEMBERS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

70.   Plaintiff and Class members are entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

   a.   Defendants made public misrepresentations and failed to disclose material facts during the Class Period;

   b.   The omissions and misrepresentations were material;

   c.   Emergent common stock traded in efficient markets;

   d.   The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Emergent common stock; and

   e.   Without knowledge of the misrepresented or omitted facts, Plaintiff and other members of the Class purchased or otherwise acquired Emergent

common stock between the time that Defendants made material misrepresentations and omissions and the time the true facts were disclosed.

71.    At all relevant times, the market for Emergent common stock was an efficient market for the following reasons, among others:

      a.    Emergent's common stock met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

      b.    As a regulated issuer, Emergent filed periodic public reports with the SEC;

      c.    Emergent common stock was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

      d.    Emergent regularly issued press releases which were carried by national newswires. Each of these releases was publicly available and entered the public marketplace.

72.    As a result of the foregoing, the market for Emergent common stock promptly digested current information regarding Emergent from all publicly available sources, and the prices of Emergent's stock reflected such information.

73.    Based upon the materially false and misleading statements and omissions of material fact alleged herein, Emergent common stock traded at artificially inflated prices during the Class Period. Plaintiff and the other members of the Class purchased Emergent common stock relying upon the integrity of the market price of Emergent common stock and other market information relating to the Company.

74.     Under these circumstances, all purchasers of Emergent common stock during the Class Period suffered similar injuries through their purchase of Emergent common stock at artificially inflated prices, and a presumption of reliance applies.

75.     Further, at all relevant times, Plaintiff and other members of the Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings. Plaintiff and the other members of the Class would not have purchased or otherwise acquired Emergent common stock at artificially inflated prices if Defendants had disclosed all material information as required. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XII.   CAUSES OF ACTION

### COUNT I
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

76.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is asserted against all Defendants.

77.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Emergent common stock; and (iii) cause Plaintiff and the other members of the Class to purchase Emergent common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

#3800655v.1

78.     Defendants directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and/or the facilities of a national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Emergent's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

79.     Defendants are liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, including the false and misleading statements and omissions included in press releases, conference calls, SEC filings, news media, blogs, and Emergent's websites.

80.     Defendants are further liable for the false and misleading statements made by Emergent's officers, management, and agents in press releases, conference calls, conferences with investors and analysts, news media, blog reports, and Emergent's websites, as alleged above, as they either made or controlled such statements and had ultimate authority and responsibility for the contents thereof.

81.     Defendants' material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing from the investing public the relevant truth. By concealing material facts from investors, Defendants maintained the Company's artificially inflated common stock prices throughout the Class Period.

#3800655v.1

82.     Without knowledge of the fact that the price of Emergent common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements and omissions made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements during the Class Period, Plaintiff and the other members of the Class purchased or acquired Emergent common stock during the Class Period at artificially high prices and were damaged when that artificial inflation was removed from the price of Emergent common stock.

83.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity. Had Plaintiff, the other members of the Class, and the marketplace known of the truth concerning the Company's conduct and the true value of Emergent's common stock, Plaintiff and other members of the Class would not have purchased or acquired their Emergent common stock, or, if they had purchased or acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices they paid.

84.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

85.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and/or acquisitions of Emergent common stock during the Class Period.

### COUNT II
### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

86.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

#3800655v.1

87.     At all relevant times during the Class Period, as set forth in ¶¶ 20-22, Defendant Kramer was the Company's President and CEO, Defendant Lindahl was Executive Vice President and the Company's CFO and Treasurer, and Defendant Husain was Senior Vice President and the Company's Head of Contract Development and Manufacturing. As such, the Individual Defendants had regular access to non-public information about Emergent's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings and meetings of the Company's Board and committees thereof, as well as reports and other information provided to them in connection therewith.

88.     The Individual Defendants acted as controlling persons of Emergent during the Class Period within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

89.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control

or influence the particular conduct and transactions giving rise to the securities violations as alleged herein, and exercised the same.

90.     As set forth above, Emergent and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a.     Declaring this action to be a class action on behalf of the Class defined herein pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

b.     Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c.     Awarding Plaintiff and the other members of the Class pre-judgment and post- judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d.     Awarding such other relief as this Court deems appropriate.

## XIV.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: May 14, 2021                                    Respectfully submitted,

**TYDINGS & ROSENBERG LLP**

*/s/ John B. Isbister*
John B. Isbister (#00639)
jisbister@tydings.com
Daniel S. Katz (#01148)
dkatz@tydings.com
1 East Pratt Street, Suite 901
Baltimore, Maryland 21202
Telephone: (410) 752-9714
Fax: (410) 727-5460

*Local Counsel for Plaintiff*

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Naumon A. Amjed (Pro Hac to be applied)
Ryan T. Degnan (Pro Hac to be applied)
Ethan J. Barlieb (Pro Hac to be applied)
Karissa J. Sauder (Pro Hac to be applied)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
namjed@ktmc.com
rdegnan@ktmc.com
ebarlieb@ktmc.com
ksauder@ktmc.com

*Counsel for Plaintiff*